18-1008. Council, please. I'm Douglas Dodd, your honor, from St. Louis, Missouri. I represent Mrs. Patterson, her husband. I would like to reserve two minutes for rebuttal, please. It's the time is in your control. Okay, so I'd like 13 and 2, if I may. We'll see how it goes. Okay. All right. So this case arises out of a skiing accident event that took place on March 20, 2016, when Mrs. Patterson and her son, Luke, and her husband, Timothy Welker, went on a ski trip to PowderMonarch down in southern Colorado. They were unloading from a ski lift, chairlift, and when they did, they lost balance. They fell. According to Mrs. Patterson, the young man that was the operator attendant was not watching. He was several feet away, 20 feet away or so from the chairlift. They go down. He reacts. He has different stories, but the long and short of it is he doesn't stop the chair in time. He doesn't go to the chair, stop, start, slow buttons. Doesn't stop it in time. The skier behind Mrs. Patterson comes down, hits her in the back of the left leg, sapped on this nerve. She's a young woman, 45 years old, very active, very physical. Ends up costing $330,000 in medical to tend to this serious injury that she has and that she currently has. Mrs. Patterson, this last Friday, just had this implanted sensory interrupter for this injury, the pain that she has. So it's a serious situation. So we filed suit. We litigate this case for $80,000 worth. I came up to Colorado three times. This is a lady, the neighbor, my son's neighbor's wife, and come out, went down to Potter Monarch, took all these depositions, experts, the whole thing. And then we get a summary judgment motion after all of that. And the district court found erroneously and clearly so that Mrs. Patterson had agreed to release her claims for personal injury based on the Jones factors. Now, I just want to say, this is a very, very, I understand there's a big recreation industry in Colorado and that there's lots of revenue, etc. But the balance of justice has changed here completely when a transaction, the judge found it was a single transaction. She bought the ticket online in St. Louis. She paid for it. No mention of a release. Said no refund in 48 hours. So by the time she got there, she's dead in the water to get her money back. That's period. Number two, when they get there, either she or her husband, they don't remember, go to pick up the ticket. The ticket has this 650 words on three by five inch piece of paper on the back of that lift ticket. I've been coming out here since 92 with my family. My daughter went to Boulder. I ski a lot. I know what skiing is. The tear off part that goes on the jacket that people throw away, that's a release, according to Judge Miley. Now, all the cases, all the release cases, Chadwick, Espinola, Hamill, Jones, Minson, Riggins, all of those are signed release cases. Those are all cases where the plaintiff signed a release. So that's a different story. Laymen don't know what a release is. Lawyers do, in general, I'm going to suggest to you. But what I'm going to say most importantly to you is releases are a huge event in the law. But as you know, releases come after litigation, not before. Releases don't come with no consideration. They don't come when they're hidden by the seller, by the defendant that's trying to protect themselves from a lawsuit. Releases come at the end, not at the beginning. So if it comes at the end and not the beginning, how can we say that Mrs. Patterson entered into a release to release her claim for her serious lifetime personal injury? How can we say that? The judge said that it was reasonable because it was fairly entered into. It could not have been fairly entered into. It could not have been. As you know, again, and I'll finish the thing on the release issue, releases are negotiated for months in personal injury cases, for months. You don't get a release by giving somebody a three by five card and say sign here and here's your million dollars. That's not the way it happens. So this is a total injustice to not only Mrs. Patterson, but to every other person that gets hurt where any court says that this kind of a release where it's hidden. If they sign a release, that's a different story. The cases that the judge relied on and that have been, I'm sorry. The district court did not find that it was hidden, did it? It was on the ticket. Pardon me? I'm sorry. The district court did not find that it was hidden, did it? It was on the ticket. Oh, no, no, no. I'm not suggesting that the court found that it was hidden. The court found quite to the contrary, that it was there and, you know, she could have read it if she wanted to. Of course, when her deposition was taken and I had filed a 12-up motion for make more definite and strike, I wanted to know what they meant by a release. When we got the deposition and the defendant pulls out this piece of paper, it shocked me. But we went through it and she said, I didn't read it. No, I didn't read it. I didn't. She had to put her glasses on to read it. Like in Stone, they said magnifying glass, if you've got to put your glasses on. It has all the legal jargon, affiliates, associates, all of that. It doesn't define activity. It's ambiguous. It doesn't use the word activity. In all the release cases, they define the term activity. And particularly in the Chadwick case, the gentleman came from Texas to ride the horse and got a mule. But the point is the facts of our case are not summary judgment facts by any stretch of the imagination. For the court to find in his own order to say this is ambiguous, hard to read, it's confusing, and he said it. And then he says as a matter of law, it's enforceable? That can't be. That has to be a jury question. And so to the extent that the defendants denied what we said in our statement of facts in our briefs and so on, that is a dispute of fact that dictates that a trial take place in this case. Putting on glasses and using a magnifying glass are two different things. Yes. That's for head readers, I'm just telling you. Well, that's not the point. I mean, Stone spoke about magnifying glasses. Yes. Well, whether that wasn't at play here, right? You wouldn't need a magnifying glass. Well, he couldn't. She couldn't read at her deposition, which was 18, 20 months after the accident. She couldn't read it. And I challenge anybody here to read that. Read those. I read it. I read it. I'm sorry. I could read it without you. Really? Yeah. Well, you're a lawyer. You're used to a judge, excuse me, used to reading things for intention. As the district court recognized, the district court, what I saw it saying was, yeah, the print is small, but you can read it. And the warning is quite clear. And the activity that it referred to was the going up on the ski lift. That was all quite clear. Whether she chose to disregard it and pull it off and not read it was her choice. But it was her choice. It was readable and the warning was clear. I understand. That's the most important part of this discussion, though, really, is the consideration. If I may. Well, how is this different than the Minson case? That's the bike or 10th Circuit case that Minson said. Right. How do you distinguish this from Minson? I'm just having I up in the air here. I have difficulty hearing. I have two hearing aids. So I just have a couple of hearing you in case and get a distinguishment from Minson. I mean, Minson seems to apply to this case. No, I don't think it does. Well, then explain how. Why not? OK. In Minson, the the court found that, of course, that a release was signed before the accident. The court said that. And the court also said that the two most important parts of the final two inquiries under the Jones factor tests that, you know, one and two are not appropriate, but three and four in recreational cases, three and four are. And there in Minson, the. The mountain bike case, what happened there is interesting. The young boy or the young man rents the bike or actually he pays for a lift ticket. He gets a bike coupon. He goes to the top of the mountain. He when he gets there, they give him a release. He signs the release. He signs a release. He could have walked away. He could have said, no, I don't. I'm not going to sign that release. I'm going to get back on the lift ride and go back down. Game over. And I want my money back, too. OK. That's why Minson is different. He signed a release. In our case, there was no release signed by Mrs. Patterson, period. That did not happen. So she was not free to walk away. Let's assume for the moment that she could read it, that she did read it. She understood it. She still didn't get any consideration for it. And as you know, the cases that we've cited in the brief, you can't have a contract without consideration. It's about mutual assent. The consideration was taking the activity, the activity that was provided. No, that was already done on the 18th. It gave her the right to ski on the 18th. But when she bought the ticket online, well, the question was whether there needed to be additional consideration for this agreement. And the point is, Minson would suggest the answer is no. And what in Minson relied upon the signature. Minson will turn on that. There were two things at least the court pointed to one, the temporal gap and the fact that they were part of the same transaction. Well, I know that that's different because, you know, it was within minutes. I think the time, this time analysis, time lapse to minutes, days, months, you know, whatever. I think that's nonsense, to be honest with you. Well, you can think it's nonsense all you want, but Minson relied upon the time gap. Well, the court kind of said that, but they said he went ahead and signed it and then went ahead and did it. OK, so signing a release is different, very, very different from having a piece of paper on the back of a lift ticket. That's just a different factual thing as a matter of practical reality. In my respectful opinion, it may be a different factual thing. It is a different factual thing, but that doesn't mean that those different facts have legal significance. That's the point we're trying to get at is whether it really matters whether you signed it or not. I mean, if she had the if she had the release agreement and no separate consideration was necessary, and that's the point by virtue of the two day interval, that there is no separate consideration necessary. And why isn't that enough? Because it's not a single transaction. If she left St. Louis, paid the fifty seven dollars, comes to Powder Monarch and they give her a ticket with no release on it, that's a single transaction. When they give her a ticket with a release on it, that's a separate legal transaction. I mean, I don't know how you can not think otherwise. Well, I mean, that's just because Minson said it. Minson said it wasn't a separate time. I mean, Minson said it wasn't a separate transaction. And Minson, the court found that it was a was all a related transaction. Yes, I know. And so, you know, say you're related. I couldn't agree with you. There were transactions are related, but they're not the same. They're just not the same. So I'm running out of time. I'm just going to go through my other points very quickly. If we're done with the you can or you can save your time. It's up to you. OK. These points have been seriously briefed. I would say that the PLA does was does not preempt. It was waived. It wasn't raised on time. We've briefed it very thoroughly. We clearly stated a cause of action under the under the Ski Safety Act beyond any question. I really do wish I had more time to discuss all those things in detail with you. And some of the arguments that I've had in courts of appeals around in St. Louis, particularly, I'm granted some extra time when there's a lot of question, you know, back and forth sort of thing. But I would request that if that's if that's appropriate. If not, I will sit down and retain my and reserve my last 26 seconds for rebuttal. Thank you. Thank you. Good morning, Your Honors. Good morning. I'm Brian Berenbeck. I represent the defendant, Powder Monarch. I'm going to jump right to the heart of the matter. I think the question on this appeal is whether or not you can have a valid exculpatory contract if the contract is contained on a ticket and the ticket is delivered after payment. I don't think this case is any different than a scenario where the guest of the ski area travels, maybe even travels a great distance, buys a plane ticket, comes to Denver, drives up to the mountain, goes to the ski area, pays for the ticket and receives the ticket containing the exculpatory clause. The fact that plaintiff here purchased the ticket or reserved the ticket on mine, according to the case law, doesn't make a legal difference. We have at least three cases where courts have upheld exculpatory provisions in similar circumstances. We have the Briggins case where this court scrutinized a Lyft ticket waiver. Conceitedly, that case also involved a signed contract, but the court considered both and found that both were enforceable, including the Lyft ticket waiver, which was delivered to the plaintiff after the purchase. The same holds true in the Rodriguez case involving an admission to go to the Royal Gorge attraction. In that case, it's an unpublished case from the Colorado Court of Appeals. The person purchased the admission ticket. The ticket had the language, the exculpatory language on the back of the ticket, and the Colorado Court of Appeals said that that ticket was enforceable. In neither of those cases did the court find that it was necessary to have a signature, as counsel has suggested. That's because under Colorado law, the use of a ticket is assent to the contract, and that's the Feeney decision which was cited by the Colorado Court of Appeals in the Rodriguez case, which is that unpublished case. Thirdly, we have the Minson decision, which Your Honors have already referred to. In that case, I don't think there's a legally meaningful distinction between that case and this case. In the Minson case, as I should say, as the district court found here, in this situation, we had an even more integrated transaction. That's because we were dealing with a pre-printed ticket. The ticket was reserved on March 18, 2014. The tickets were already printed, and then the plaintiff picked up that ticket containing the exculpatory clause. In Minson, the plaintiff was asked to sign a separate written instrument. So in our case, as the district court found, we have an integrated transaction, and I don't think the two days... The difference being here, had she said, hey, I'm not willing to, I don't want to release liability, she could have obviously walked away, but she would not have gotten her money back, right? Right, and I think according to the case law, that doesn't invalidate the exculpatory provision. The plaintiff is arguing she wasn't free to walk away because she would have lost the money, but when the cases talk about being free to walk away, they're talking about the liberty to walk away, being able to walk away, and you're able to walk away because recreation is not a necessary good, like housing or employment or utilities or sanitation. So she was free to walk away. The problem that when they bought the tickets, the exculpatory clause was not there. And so she was not on notice of the exculpatory clause until later when she was not free to undo the previous contract. But that was the case in Briggins and Rodriguez as well. The tickets were purchased. The tickets indicated right on the ticket that they were nonrefundable, and the plaintiffs didn't have an opportunity to see the exculpatory clause until after payment was tendered. And they went ahead and used the ticket. So I don't think there's a meaningful distinction between the Briggins ticket, the Rodriguez ticket, from the ticket in this case. On your free to walk away discussion, have you found any – I understand the inference that you derived from the cases that focused on sort of necessities and when they were talking about whether you were free to walk away. Have you found any cases that specifically address the argument that I hear appellant making, which is essentially that, you know, I paid $57 and therefore I couldn't – it was the economics equals freedom sort of thing. The idea of the financial costs meant that I really wasn't free. Not in the context of an exculpatory provision, but there's a line of cases in admiralty law or maritime law involving forum selection clauses, and so it's probably 1988 since I looked at an admiralty case, and I don't – all right. But, you know, the leading case on that is from the U.S. Supreme Court. I think it's Carnival Cruise Lines v. Chute. In that case, the passenger on a cruise line, she received the ticket. The ticket was nonrefundable, and the ticket had a forum selection clause, and the Supreme Court majority in that case said even though you already paid for the ticket, the ticket was not refundable, the forum selection clause – and the court was considering whether the forum selection clause was fair – was still enforceable notwithstanding that no refund provision. So I think that's most akin to what we have in this case. And again, if we look at the case law, the focus is whether or not there's an unequal bargaining power, and there's – according to the Colorado case law as applied by this court, that exists only in cases where you're bargaining for something of practical necessity, and so the courts have routinely found that in cases of recreation, that unfairness doesn't exist. Counsel, what bothers me on this free-to-walk-away is that that's a metaphor. What are we she free to walk away from? She is free to walk away from the contract, and if she's free to walk away from the contract, included in that is a nonrefundable provision. Right, except the focus is on whether she needed that service, and she was at liberty, perhaps at the risk of losing the money, to walk away from the transaction. And I would submit that, if at all, she might have a claim for a refund of the $57 if she didn't. You need to stay in front of that microphone. My apologies. My android ears need a little help. And I think what matters here is that she went ahead and used the ticket, so she agreed to the terms of the ticket by her use of the ticket. She never had an objection to the exculpatory provision in the ticket, and she went ahead and used the ticket, demonstrating her assent. I think it's significant on that point. She readily allowed her husband to sign exculpatory clauses on behalf of her children, so she didn't have any reservation about waiving her rights to sue as a condition to skiing at Monarch. So that issue never came. She was never placed in that situation where she had to make the choice between forgoing her $57 because she was unwilling to give up her right to sue. That just didn't happen in the facts of this case. As far as the ticket size and the language, I'll rely on my brief unless Your Honors have any questions. Thank you for your argument, Counsel. The Minson court addressed the fact that the transaction took place at the mountain. So that's a different situation. We have 900 miles between St. Louis and Monarch driving time. So I don't know. This is the first I've heard about a refund claim. But in any event, you're right, Your Honor, that was a metaphor. She would have been out her money even if she did walk away, so it wasn't free. So thank you very much for your time. Appreciate it very much. Thank you, Counsel, for your arguments. We will be in recess for about 10 minutes. Thank you.